JUDGE CEDARBAUM

MARK K. SCHONFELD (MS-2798)
REGIONAL DIRECTOR

08 CV 01538

Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10281
(212) 336-0077 (Gizzi)


RECEIVED FEB 1 4 2008 U.S.D.C. S.D. N.Y. CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                                                           :
SECURITIES AND EXCHANGE COMMISSION,                        :
                                                           :
                              Plaintiff,                   :
                                                           :
              - against -                                  :
                                                           :
MARK BARBERA,                                              :
                                                           :      **COMPLAINT**
                              Defendant.                   :
                                                           :
-----------------------------------------------------------x

The plaintiff Securities and Exchange Commission ("Commission") alleges the following against defendant Mark Barbera ("Barbera" or the "Defendant"):

### SUMMARY

1.  This matter concerns a scheme to defraud mutual funds through, among other conduct, late trading of mutual funds through Trautman Wasserman & Company, Inc. ("TWCO"), a registered broker-dealer. Between January 2001 and September 2003, TWCO accepted thousands of orders from its hedge fund customers to trade mutual funds after 4:00 p.m. ET, but executed the trades as though they had been received prior to 4:00 p.m. ET. In addition, TWCO employed deceptive tactics to evade mutual funds' efforts to restrict TWCO's hedge

fund customers' market timing of mutual funds. This illegal conduct generated significant revenues for TWCO and harmed mutual fund investors by diluting the value of their investment.

2.  TWCO's mutual fund trading department consisted principally of two registered representatives ("RRs"), James A. Wilson, Jr. ("Wilson") and Scott A. Christian ("Christian"). Wilson directed the late trading and market timing schemes, and he personally accepted customers' late trading orders. Christian handled day-to-day communications with customers, and he regularly accepted and entered late trades. In carrying out the fraudulent late trading scheme, Wilson and Christian created records falsely indicating that customers had placed trades before 4 p.m.

3.  Barbera, TWCO's chief financial officer ("CFO"), was present for parts of various discussions between other TWCO partners and officers, including TWCO's Chief Executive Officer ("CEO") and Chairman, and Wilson where the practice of submitting trades after 4:00 p.m. ET was discussed. In addition, Barbera sought capacity that could be used for mutual fund trading. Further, Barbera approved using TWCO assets to trade mutual funds through a proprietary account, which subsequently traded on the basis of news and market conditions after the market close, but those trades were priced at that day's net asset value (NAV). The CEO of TWCO generally placed the trades in the proprietary account.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

4.  The Commission brings this action pursuant to the authority conferred upon it by Section 20(d) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77t(d), seeking civil money penalties.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(d) and 77v(a).

6. Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a). Barbera resides in Bronxville, New York. Certain of the transactions, acts, practices, and courses of business alleged herein occurred within the Southern District of New York. For instance, TWCO maintained its principal place of business in New York, New York, and Barbera engaged in the conduct alleged herein while working at TWCO's office located in New York, New York.

7. Barbera, directly or indirectly, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and/or the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

## DEFENDANT AND RELEVANT ENTITY

8. **Barbera,** age 50, is a resident of Bronxville, New York. Barbera has been CFO of TWCO since 1993. At all relevant times, Barbera was associated with TWCO. Barbera holds or has held Series 3, 4, 7, 24, 27 and 63 licenses.

9. **TWCO,** based in New York, New York, was at all relevant times a broker-dealer registered with the Commission.

## FACTS

### Late Trading

10. Rule 22c-1(a), 17 C.F.R. § 270.22c-1, as adopted under Section 22(c) of the Investment Company Act of 1940 ("Investment Company Act"), 15 U.S.C. § 80a-22(c), requires investment companies issuing redeemable securities, their principal underwriters and dealers, and any person designated in the fund's prospectus as authorized to consummate transactions in securities issued by the fund to sell and redeem fund shares at a price based on the current net

asset value ("NAV") next computed after receipt of an order to buy or redeem. Mutual funds generally determine the daily price of their mutual fund shares as of 4:00 p.m. ET. In these circumstances, orders received before 4:00 p.m. ET must be executed at the price determined as of 4:00 p.m. ET that day. Orders received after 4:00 p.m. ET must be executed at the price determined as of 4:00 p.m. ET the next trading day.

11.    "Late trading" refers to the practice of placing orders to buy or sell mutual fund shares after the time as of which a mutual fund has calculated its NAV (usually as of the close of trading at 4:00 p.m. ET), but receiving the price based on the prior NAV already determined as of 4:00 p.m. ET. Late trading enables the trader to profit from market events that occur after 4:00 p.m. ET but that are not reflected in that day's price. In particular, the late trader obtains an advantage – at the expense of the other shareholders of the mutual fund – when he learns of market moving information and is able to purchase (or sell) mutual fund shares at prices set *before* the market moving information was released. Late trading violates Rule 22c-1(a) under the Investment Company Act. Late trading also harms shareholders, for instance, when late trading dilutes the value of their shares.

## Late Trading At TWCO

12.    In 2000, the Chairman of TWCO began attempting to set up a mutual fund trading operation at TWCO. The Chairman recruited Wilson and Christian, who were at that time working at another broker-dealer. While interviewing for their positions at TWCO, Wilson and Christian learned that TWCO's clearing broker, Banc of America Securities, LLC ("B of A"), offered a mutual fund trading system that allowed mutual fund trades to be entered until 8:30 p.m. ET and still be priced at the same NAV as orders submitted by 4:00 p.m. ET. The Chairman, who managed TWCO's relationship with B of A, arranged meetings between Wilson, Christian, and B of A representatives so that they could discuss the mutual fund trading platform.

4

After these meetings, Wilson and Christian realized that they could directly enter mutual fund trades into this system, thereby bypassing the B of A mutual fund desk.

13. Wilson and Christian began working at TWCO in December 2000.

14. Although the B of A system allowed orders to be entered and processed as late as 8:30 p.m. ET, Wilson and Christian were aware that they were supposed to receive orders from customers by 4:00 p.m. ET in order to execute them at that day's price. For example, B of A's "Mutual Funds Processing" manual that B of A provided to TWCO required that: "All orders should be received and time stamped by the close of the NYSE, 4 PM EST."

15. Wilson and Christian then contacted their former market timing customers as well as other prospective customers to pitch the advantages of the market timing and late trading system that they were developing at TWCO. In return, Wilson extracted extra compensation for providing late trading. For example, on April 11, 2001, the manager of a hedge fund, Hedge Fund A, that was interested in late trading sent an e-mail to Wilson complaining that TWCO was "earning double what everyone else takes home on this business," and that "[y]ou currently earn 2% p.a. [per annum]." Further, the manager of Hedge Fund A complained that "[y]our facility for late trading is not the only one we have," and that "[i]n all the other cases, we pay 1% p.a." On April 11, 2001, Wilson sent an e-mail to Hedge Fund A's manager indicating that "**we are the only place to trade late past 530**" (emphasis in original), and "thus you have to pay more." On May 1, 2001, the hedge fund manager notified Wilson by e-mail that Hedge Fund A was sending funds to begin trading. The hedge fund manager described how the late trading would work as follows:

> In essence, most of it will be done by you within certain parameters that we will give you each day. In the majority of cases, your decision point will be 5:30pm NY time. In a few cases, your decision point will be 6:30pm – I know, slave labor...whatever will you do working that late!

16. Wilson directed the daily operations of his and Christian's late trading and market timing business. At Wilson's direction, Christian and another TWCO employee entered tens of thousands of late trades for Wilson's customers. Moreover, Wilson directed Christian and the other employee to create false records, "for compliance reasons," intended to show that TWCO had received the customer's trading orders prior to 4:00 p.m. ET.

17. On a daily basis, customers sent tentative instructions to purchase or redeem mutual fund shares to TWCO during the day, beginning at approximately 12 noon ET. TWCO treated these trading instructions as order tickets. As the trading instructions came in, Christian would collect them, but he would not enter the orders or time stamp the order tickets. Rather, Christian waited until shortly before 4:00 p.m. ET to time stamp the order tickets.

18. Christian sometimes forgot to time stamp the order tickets before 4:00 p.m. ET, resulting in some order tickets that were stamped after 4:00 p.m. ET. Wilson eventually gave Christian an alarm clock, which Christian set to go off shortly before 4:00 p.m. ET to remind him to stamp the order tickets. When the alarm went off, Christian and the other TWCO employee would time stamp the trading instructions. This practice made it appear as if TWCO received the instructions shortly before 4:00 p.m. ET.

19. However, Christian and the other employee did not enter the orders into the B of A mutual fund trading system when they time stamped the orders. Instead, between 4:00 p.m. ET and 6:30 p.m. ET, Wilson, Christian, or the other employee spoke with customers to get their final trading decisions.

20. Sometimes customers gave final trading instructions that were "cancellations" or partial cancellations of the tentative orders placed earlier in the day. Often, customers submitted wholly new orders that were not part of the tentative instructions they had submitted earlier in

the day. Only then did Christian or the other employee enter the trading orders, without creating a new or modified order ticket reflecting the actual order or with the correct time stamp on the ticket.

21.  TWCO, through Wilson and Christian, routinely accepted mutual fund trading instructions for Hedge Fund A, as well as for two other hedge funds, Hedge Fund B and Hedge Fund C, well past 4:00 p.m. ET and often as late as between 5:00 and 6:45 p.m. ET. For these customers, virtually all the trading in mutual funds at TWCO consisted of late trading.

22.  Wilson also personally took customers' mutual fund orders to engage in late trading. For example, tape recordings made at Hedge Fund B of telephone calls indicate that Wilson accepted mutual fund orders at 4:41 p.m. ET on February 14, 2003, at 5:17 p.m. ET on September 27, 2001, and at 6:08 p.m. ET on December 18, 2001. After receiving these orders, Wilson then entered the trades so they could be executed at the same day's NAV.

23.  Further, Wilson was fully aware of the procedures that Christian and the other employee routinely used for executing late trades. For example, on February 14, 2003, at 4:41 p.m. ET, a trader at Hedge Fund B telephoned TWCO and said, "Hey, Jim, it's [a representative of Hedge Fund B]. ... You got Scott or [the other employee] there to take some trades?" Wilson replied, "I can help you," and proceeded to accept Hedge Fund B's late trading decisions. Wilson then said, "Let me just read this back to you. I haven't done this in a while so I don't have any embarrassing situations." On September 27, 2001 at 5:17 p.m. ET, the same representative of Hedge Fund B telephoned TWCO and asked for Christian. Wilson said that Christian had just stepped away, offered to take the order, and said he would "grab the sheets" off Christian's desk, referring to the trading instructions sent by Hedge Fund B and time stamped by TWCO before 4:00 p.m. ET. Wilson proceeded to accept Hedge Fund B's instructions as to

7

which trades on the trading instructions it wished to confirm, cancel, or modify. Wilson concluded by telling Hedge Fund B's representative that he could call with additional trading decisions until 5:30 p.m. ET.

24. Further, as evident from his April 11, 2001 email to Hedge Fund A quoted above (demanding higher fees because of the value of late trading), Wilson knew that TWCO's hedge fund customers benefited from the ability to late trade. Wilson knew that customers factored into their trading decisions after-hours news announcements and market conditions. For example, he knew from e-mails with Hedge Fund A that the hedge fund based its trading instructions on parameters for after-hours index futures prices that Hedge Fund A provided to TWCO.

25. At Wilson's direction, Christian and the other TWCO employee regularly helped customers follow calendars of corporate earnings announcements and relayed to customers information regarding notable developments after the market close. Further, Christian frequently provided customers shortly after 4:00 p.m. ET with newly-calculated mutual fund NAVs reflecting the current day's pricing. This allowed customers to compare the NAVs of mutual funds against after hours trading in stocks in those funds, and thereby compute with some degree of precision the actual trading profit they would make on a given late trade.

**TWCO Partners Approved and/or Participated in Late Trading**

26. An executive committee consisting of the firm's principals, including TWCO's CEO, TWCO's Chairman, and Barbera, managed TWCO. The executive committee held regular weekly meetings and other ad hoc meetings to discuss the business of the firm and to engage in planning and decision-making. TWCO's CEO and TWCO's Chairman were aware of Wilson's and Christian's late trading.

27. Barbera was present for parts of various discussions between other TWCO partners and officers, including TWCO's CEO and Chairman, and Wilson where the practice of submitting trades after 4:00 p.m. ET was discussed.

28. TWCO's CEO offered late trading to at least one of his customers ("Customer 89001"). With Barbera present, TWCO's CEO explained to Customer 89001 that when deciding to purchase shares of mutual funds, for instance, TWCO would use a "trigger." The trigger was when the price of stock futures contracts rose by 1.5% in after-hours (post-4:00 p.m. ET) trading. TWCO's CEO told Customer 89001, and Barbera confirmed to Customer 89001, that TWCO's CEO had made money on 13 of 15 trades using this system. Customer 89001 then invested with TWCO. TWCO placed Customer 89001's funds in a TWCO brokerage account. Subsequently, TWCO's CEO placed late trades for Customer 89001's account.

29. The TWCO partners actively participated in the mutual fund business by seeking timing capacity from fund companies. In particular, TWCO's CEO used a personal friendship with a fund manager at one fund complex to obtain large amounts of capacity. Further, TWCO's Chairman used his long-standing contacts at another fund complex to increase TWCO's capacity in those funds. Neither TWCO's CEO nor TWCO's Chairman disclosed to the fund complexes that TWCO would use the capacity for late trading.

30. Barbera also engaged in efforts to obtain capacity. At various times in 2002 and 2003, Barbera sought timing capacity from other entities that could be used for mutual fund trading on behalf of TWCO's customers.

31. In September 2002, Barbera drafted a letter agreement setting forth the fee arrangement for a $5 million discretionary account established by one customer, which TWCO's CEO, TWCO's Chairman, Wilson, and Christian knew would be used for late trading. Barbera

should have known that others intended to and did use this account to place trades after 4:00 p.m. ET.

32. Also in the spring of 2003, Barbera and Christian sought to develop a relationship with a data processing firm for the purpose of enabling TWCO to engage in mutual fund trading apart from the B of A system.

33. In addition, Wilson persuaded TWCO's partners to establish a proprietary account with the firm's money to serve as the basis for a TWCO managed hedge fund. In late 2001, TWCO opened a mutual fund trading account, and TWCO ultimately deposited approximately $500,000 into the account. Initially, the TWCO proprietary account copied the market timing trades of a TWCO customer. When the account started losing money, TWCO's CEO took charge of trading in the account. TWCO's CEO then began to make trading decisions in the account based on news developments that occurred after 4:00 p.m. ET.

34. Subsequently, TWCO's CEO often went to Wilson's and Christian's office at TWCO after the market close to decide whether to place mutual fund trades in the TWCO account based on news and market conditions after 4:00 p.m. ET. TWCO's CEO occasionally referred to the ability to trade late on news or post-4:00 p.m. ET futures market conditions as the firm's "elixir," "magic potion," or "special juice."

35. Barbera monitored the TWCO proprietary account for net capital purposes.

## CLAIM FOR RELIEF

### Violations of Section 17(a)(2) of the Securities Act

36. The Commission repeats and realleges paragraphs 1 through 35 above.

37. As a result of the conduct described above, Barbera violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), which makes it unlawful for any person in the offer or

sale of securities, directly or indirectly, to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment ordering Barbera to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d).

Dated: New York, New York
February 7, 2008

Mark K. Schonfeld (MS-2798)
Regional Director

Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10279
(212) 336-0077 (Gizzi)

Of Counsel:

Alexander M. Vasilescu
Kay L. Lackey (not admitted in New York)
Paul G. Gizzi
Robert M. Murphy
Bennett Ellenbogen
Sandeep Satwalekar (not admitted in S.D.N.Y.)